Argued May 3, 1948; reversed and remanded July 7, 1948

PALM *v.* SMITH ET AL. and CATHOLIC
CHARITIES, INC.

195 P. (2d) 708

618

*Thomas H. Ryan,* of Portland, argued the cause for plaintiff-appellant. With him on the brief was Anthony Pelay, Jr., of Portland.

*Irving Rand,* of Portland, argued the cause for defendant-appellant. With him on the brief was Joseph Van Hoomissen, of Portland.

*P. W. Mahoney,* of Heppner, and *W. C. Perry,* of Pendleton, argued the cause for respondents. With P. W. Mahoney on the brief were Randall, Perry & Wells, of Pendleton.

Before ROSSMAN, Chief Justice, and BELT, BAILEY and BRAND, Justices.

BELT, J.

This is a suit, commenced in April, 1947, to set aside and vacate an order of the County Court of Morrow county purporting to grant to the defendants Smith the right to adopt a minor child, born August 14, 1942, a daughter of the plaintiff Constance Palm.

Catholic Charities, Inc. was made a party defendant by order of the court so that there could be a complete determination of the issues. The defendants Smith demurred to the Second Amended Complaint for the following reasons: (1) Plaintiff is not the real party in interest. (2) It fails to state facts sufficient to constitute a cause of suit. They also demurred to the cross-complaint of the defendant Catholic Charities, Inc. upon the grounds: (1) It fails to state facts sufficient to constitute a cause of suit. (2) Such defendant "is without legal capacity to bring or maintain this suit." From a decree sustaining a demurrer to the Second Amended Complaint and to the Answer and Cross Complaint, the plaintiff and the Catholic Charities, Inc. appeal.

It appears from the pleadings—in so far as material herein—that this controversy over the custody of a minor child arose as follows:

On May 26, 1944, the Circuit Court of Multnomah county, Domestic Relations Department, Judge Fred W. Bronn presiding, on petition of the plaintiff mother, permanently committed the child in question to the Oregon Protective Society at Portland, Oregon—a charitable organization incorporated under the laws of Oregon and duly licensed to act as a "private child-caring agency" in accepting commitments of dependent children. In the order of commitment it was decreed that:

"If the said child (Melody Palm) should be found in a reasonable time to be mentally or physically defective or afflicted with tuberculosis, gonorrhea, syphilis, or requiring extended medical or surgical treatment, or difficult to place because of behavior problems, then said child may be returned to this Court upon making proper showing.

"* * * Oregon Protective Society shall have the authority to place the said child in a family home, with or without indenture, and be made a party to any proceeding for the legal adoption of the said child and may by its attorney or agent appear in any Court where such proceedings are pending and assent to such adoption and such assent shall be sufficient to authorize the Court to enter a proper order or decree of adoption."

On April 16, 1945—while the child was in Multnomah county—the plaintiff filed a petition with the Circuit Court of Multnomah county, Domestic Relations Department, for the purpose of revoking the above order of commitment and restoring the child to her. Plaintiff's attorney died while this matter was pending and thereby caused delay in disposing of the same.

Thereafter on October 9, 1946, a general appearance was made in said Court by the Oregon Protective Society and a "conference" was held between the juvenile authorities for Multnomah county, the Oregon Protective Society, and the Catholic Charities, Inc., whereby it was disclosed that the plaintiff was a Catholic and that her child, Melody, was baptized in the same religious faith. The question as to whether the child should be placed with the Catholic Charities, Inc. was submitted by the interested parties to the Circuit Court of Multnomah county, Domestic Relations Department, Judge Donald E. Long presiding, for decision. In November, 1946, plaintiff filed a second petition praying for the revocation of the order of commitment to the Oregon Protective Society and asking that her child be restored to her or that it be committed to the Catholic Charities, Inc.—an institution incorporated under the laws of Oregon and engaged, among other things, in the same kind of work

as the Oregon Protective Society. The Catholic Charities, Inc., however, as its name implies, cares primarily for dependent children of the Roman Catholic faith. The Oregon Protective Society devotes its time primarily to non-Catholic dependent children.

On December 20, 1946, a hearing was had in the Circuit Court on the second petition of the plaintiff—Oregon Protective Society appearing by its attorney and its Secretary—and on January 9, 1947, a decision was rendered revoking the commitment to the Oregon Protective Society and committing the child to the Catholic Charities, Inc., for the reason that the child—in view of its baptism—was inadvertently placed with the Oregon Protective Society and that such mistake should be corrected.

Before the decision in the second petition to revoke the order of commitment was rendered, the Oregon Protective Society on July 13, 1946, placed Melody, on a "boarding care basis," with the defendants-respondents Orville L. Smith and his wife, June L. Smith.

On January 29, 1947, Orville Smith and his wife filed a petition with the County Court of Morrow county for the adoption of Melody Palm. On the following day the Oregon Protective Society filed its consent for such adoption. On February 4, 1947, the County Court entered an order purporting to authorize the adoption of the child by the defendants Smith.

On February 25, 1947, the Circuit Court of Multnomah county, Domestic Relations Department, entered findings of fact, conclusions of law, and a decree—nunc pro tunc as of January 9, 1947—setting aside the commitment to the Oregon Protective Society and permanently committing the child to the Catholic Charities, Inc.

The Circuit Court of Multnomah county, after a recital of the appearance of the petitioner, Oregon Protective Society, Multnomah County Public Welfare Commission, and Catholic Charities, Inc., made the following findings of fact and conclusions of law:

"I.

"That said Melody Palm is a member of the Roman Catholic Church having been baptized January 17, 1943, at the Star of the Sea Church in San Francisco, California.

II.

"That said child has been placed in a non-Catholic home by the Oregon Protective Society.

III.

"That said child has been committed to the Oregon Protective Society, a corporation to which non-Catholic children are committed and that the commitment to said society was made by a mistake in the child's religion; that Catholic Charities, Inc. is a corporation to which Catholic children are committed.

IV.

"That heretofore a Petition for Appointment of Guardian Ad Litem was denied on the grounds that the mother, Constance Palm and personal petitioner had a standing before this Court in regard to her child, and further that the State of Oregon at all times has the right to have inquiry made regarding the welfare of dependent children.

"As conclusions of law from the foregoing facts, the Court concludes that said child is entitled to be raised a Roman Catholic and that the commitment should be revoked and that said child be permanently committed to the Catholic Charities, Inc. and be raised as a Roman Catholic."

Based upon such findings and conclusions, the decree was entered nunc pro tunc as of January 9, 1947.

It is alleged in substance—and admitted on demurrer—that the Oregon Protective Society and the defendants Smith failed to notify the County Court of Morrow county, at the time of making its order of adoption, of the revocation by the Circuit Court of Multnomah county of the commitment of the child to Oregon Protective Society and of its commitment to the Catholic Charities, Inc., although they had knowledge thereof. It is further alleged that neither the Catholic Charities, Inc. or the plaintiff had notice of the purported adoption proceedings in Morrow county.

■ Undoubtedly the Circuit Court of Multnomah county, at the time of making its permanent order of commitment to the Oregon Protective Society, had jurisdiction of the subject matter and of the person. We inquire: In what way, if at all, did the Circuit Court lose jurisdiction? Did it have jurisdiction at the time the County Court of Morrow county entertained the petition for the adoption of the child? The answer to these questions depends upon whether the Circuit Court, after having made a "permanent" commitment to the Oregon Protective Society, had authority thereafter to revoke such commitment. If it did retain jurisdiction for such purpose, it is clear that the adoption proceedings in Morrow county are null and void. It is well settled that as between courts of concurrent jurisdiction, the court first acquiring jurisdiction will retain it until final disposition of the issue under consideration has been made. *LaFollett v. LaFollett,* 136 Or. 332, 288 P. 507, 299 P. 299; *Matlock v. Matlock,* 87 Or. 307, 170 P. 528; *Ex parte Bowers,* 78 Or. 390, 153 P. 412; 21 C. J. S. 745, § 492.

■■ It is the contention of defendants-respondents that the Circuit Court, after having made a permanent

commitment to the Oregon Protective Society, completely lost jurisdiction over this dependent child. We do not agree. It is conceded that the Circuit Court would have no jurisdiction to act after there had been a legal adoption, but in the instant case we think the adoption proceedings are of no force or effect. The Oregon Protective Society was not authorized to give consent to such adoption. It appeared before the Circuit Court and objected to the revocation of the commitment. A decision was rendered revoking the commitment, and the Oregon Protective Society did not appeal therefrom. How could the Oregon Protective Society in view of this adjudication thereafter give consent to such adoption when at such time it knew the order of commitment had been revoked? Had the County Court been informed of the revocation order of commitment by the Circuit Court of Multnomah county, it is doubtful whether the order of adoption would have been made. Furthermore, it may be that if such "child-caring agency" had functioned in keeping with the purpose and spirit of § 126-331, O. C. L. A., this unfortunate controversy, involving heartache and sorrow, might not be here. Such section provides:

" * * * All children placed out in private families shall be, so far as it is practicable, located with those of the same religious faith as that held by the children themselves, or their parents."

The pertinent sections of the statute, in so far as material herein, are as follows:

"§ 93-609. Commitment of dependent or neglected children: Setting aside or modifying order: Placing child in hospital. When any child under the age of eighteen years shall be found to be dependent or neglected, within the meaning of this act, the court may make an order committing the child to the care of some suitable state institution,

or to the care of some reputable citizen of good moral character, or to the care of some institution as may be provided by law, or to the care of some suitable association willing to receive it, embracing in its objects the purpose of caring or of obtaining homes for dependent or neglected children. *The court may thereafter set aside, change, or modify such order.* The court may, when the health or condition of the child shall require it, cause the child to be placed in a public hospital or institution for treatment or special care, or in a private hospital or institution which will receive it for like purposes. (L. 1907, ch. 34, § 8, p. 39; L. O. L. § 4414; O. L. § 9808; O. C. 1930, §§ 33-626.)'' (Italics ours.)

''§ 93-610. Temporary and permanent commitments. Commitments by competent courts of the state under regular procedure as required by law, shall be defined as follows: Courts of competent jurisdiction upon proceedings as provided by law shall commit dependent or delinquent children to appropriate state and county institutions, or to the suitable private child-caring agencies, societies, or institutions that are duly and properly licensed as hereinafter provided. Such commitments of the courts shall be of two kinds or grades, temporary or permanent; and each order shall definitely specify to which kind or grade the commitment belongs. Temporary commitments shall be made when the court for good and sufficient reasons decides that final adjudication of the case must be delayed, or that the child or children involved can reasonably be expected to soon return to ordinary home conditions in their own families; and in temporary orders of commitment guardianship of the persons of the children shall remain with the court, and children under such orders may be recalled by the court for further action at any time. Permanent commitments of dependent or delinquent children shall include and bear with them guardianship of the persons of such children; and the state, or county officials or other persons charged with the

control and management of the public institutions to which the commitments are made, or the responsible trustees, managers or officers of the private agencies, societies or institutions to which the children are thus assigned shall be accountable for the personal welfare, guidance and supervision of such wards during their minority, *or until they are otherwise disposed of by subsequent orders of courts of competent jurisdiction.* (L. 1919, ch. 405, § 3, subds. 1-3, p. 734; O.L. § 9809; O.C. 1930, § 33-627.)'' (Italics ours.)

■ It is observed that the court derives its authority to make commitments of dependent children from § 93-609 and not from § 93-610. Opinions of the Attorney General, 1936-1938, page 707. After having made the order of commitment, the court is further authorized in § 93-609 to ''set aside, change, or modify'' such order. Section 93-610 merely defines the term ''commitment'' as used elsewhere in the Act. We appreciate that there is language in the last section tending to indicate a surrender of jurisdiction when a permanent commitment is made, but it is believed that the plain and unambiguous language of § 93-609 controls. We are of the opinion that the authority conferred upon the court to ''set aside, change, or modify'' the order of commitment has not been repealed by implication. We are reluctant to believe that the legislature intended to deprive a Juvenile Court of the power to change any order of commitment when the welfare of the dependent child so demanded. We do not, of course, imply that the Circuit Court would be authorized to change an order of commitment after another court of coordinate power had acquired jurisdiction.

■■ A minor deprived of parental care and control is a ward of the State, and it maintains its sovereign

power of guardianship through its duly constituted agencies. To hold that a Juvenile Court, after making a permanent commitment of a dependent child to a "child-caring agency," is powerless to correct a mistake of such vital nature, as involved herein, violates, in our opinion, the plain intendment of the Act. The Act should be given a liberal construction in order best to promote the welfare of the child.

In the case of *In re Baker,* 152 Or. 574, 54 P. (2d) 309, decided in 1936, three minor dependent children were, under a permanent order, committed to the Boys' and Girls' Aid Society of Oregon. The father filed a motion to set aside the order of commitment. The court denied the motion, but "changed and modified said order of commitment from a permanent commitment to a temporary order." On appeal this court affirmed the order of modification. This case supports the contention of appellants that a Juvenile Court has jurisdiction to "set aside, change, or modify" a permanent order of commitment.

Defendants Smith rely strongly on *McClain et ux v. Superior Court of Chelan County,* 112 Wash. 260, 191 P. 852. In our opinion this case is not in point, although some of the language therein tends to support the contention of the respondents Smith. In the Washington case a dependent child was committed by a permanent order by the Juvenile Court of Clark county to the Washington Children's Home in Seattle. The child was thereafter placed by such agency in the home of the McClains, who resided in Chelan county, Washington. McClains petitioned the Superior Court of Chelan county to adopt the child. The Court denied the petition on the ground that the County Court of Clark county retained jurisdiction. On appeal, the order dismissing the petition was reversed—the Su-

preme Court holding that the Clark County Court had completely surrendered jurisdiction. In the instant case the Circuit Court of Multnomah county was exercising jurisdiction by entertaining a motion to vacate and set aside a permanent order of commitment. In the Washington case, the Clark County Court was not exercising jurisdiction but doing what it could to "rid itself of jurisdiction."

We do not believe the other grounds of demurrer merit much discussion. Plaintiff and the Catholic Charities, Inc. seek substantially the same relief. Catholic Charities, Inc. was made a party defendant by order of the court. It would seem not to require much argument that a mother—although her sins be as scarlet—should have the right to be heard in court on a matter affecting the welfare of her child.

We are not unmindful of the love and affection which the Smiths undoubtedly have for this little girl and that they are able and willing to provide a good home for her. However, the adoption proceedings are void and no rights can be predicated thereon. The decree of the Circuit Court of Multnomah county— since it retained jurisdiction—must be given force and effect. In view of the undisputed facts and the admitted records, it would be of no avail for the defendants Smith to answer over.

It follows that the decree of the Circuit Court of Morrow county in sustaining the adoption proceedings is reversed and the cause remanded with directions to the Circuit Court to set aside and vacate such proceedings, and to order the defendants Smith to deliver the child to the Catholic Charities, Inc. Each party will pay its own costs and disbursements.